Next case on our call is Agenda No. 21, Case Numbers 105-912 and 105-917, Consolidated. Daniel Yoerger v. Halverson Construction Co. Thank you, Your Honor. I am David Miller of the law firm of the Cassidy & Miller. I am here representing the Midwest Foundation Halverson Joint Venture. I'm going to be dividing my argument with Greg Cirulo, who is representing Halverson Construction Co. The issue before this Court is whether or not joint liability also begets, by its very nature, joint defenses and immunities. We submit that it does. As I indicated, I represent the joint venture, and I will state at the outset that the joint venture on this project, which was the rehabilitation of the McCluggage Bridge in Peoria, Illinois, paid all of the bills for the project, including payroll, and also including payroll-related expenses, which would include the premiums for workers' compensation policies. That joint undertaking include employees as well? Were they employed both by Midwest and the joint venture? The employees were employed, as the joint venture agreement points out in paragraph 21, by Midwest Foundation, which had the responsibility for labor on the job. The expenses incurred by Midwest in that respect were then submitted to the joint venture and reimbursed by the joint venture, But I guess my question is, does it make a difference that the employees may not have been the employees of both? I submit not. The only distinction here, and this gets us to the heart of the issue as to why joint exposure or joint liability also begets joint immunities, because by operation of law and by operation of the joint venture agreement itself, the joint venture was responsible for the payroll and all payroll-related expenditures, as was the co-joint venture Helverson Construction Company. They accepted that responsibility, which meant, assuming that Midwest Foundation did not meet the payroll or Midwest Foundation did not pay the workers' compensation premiums, that would be the obligation of the joint venture by operation of law and by operation of the agreement, as well as the obligation of Helverson. So if we are talking about employment, possibly the key is to define employment by its various categories. The only thing that the joint venture and Helverson didn't have was the right of supervision and control over those employees. They were obligated for all obligations related to payroll, and the joint venture met and satisfied those. Therefore, the joint venture actually paid the workers' compensation premiums for the workers' compensation benefits that were received by each of these employees. It was not only obligated in that regard, it satisfied that obligation. This case brings up... How did it satisfy that obligation, Counsel? What did it do that satisfied that obligation? It wrote the checks which reimbursed the workers' compensation premiums that were paid by Midwest Foundation. Was that before the accident or after the accident? Before. How long a period before? At the time, contemporaneously with the month in which the premium fell due and with the payroll date in which the payroll fell due. Multiple payments were made. Multiple payments on a monthly basis. Now this brings me around to when we were all in law school and we were taking various courses on partnerships and corporations, what we refer to today by lumping together as business organizations. In a partnership, and I happen to practice law in one, and a joint venture is nothing but a partnership for a single purpose, all of the revenue comes to the partnership, all of the expenses come to the partnership, the partnership writes the checks, and at the end, you see whether there's a profit or a loss. In this case, the split was 60-40, so if there was a profit, 60% of the net, after all of those expenses were paid, would go to Midwest Foundation and 40% to Halverson. So you cannot have a partnership or a joint venture by their nature without also having the partnership or the joint venture receive all of the monies, and that is what the partnership agreement here says, that's what the joint venture agreement, that's what the Uniform Partnership Act requires, and then at the same time, having the entity, the partnership, or the joint venture pay all of the expenses. And that's exactly what happened in this case. And the only testimony in the record is that of the CFO of the joint venture, who was also the chief financial operating officer of Midwest Foundation, saying that yes, the payroll expenses were submitted by Midwest Foundation to the joint venture and paid contemporaneously. At the same time, you have identical testimony from Steve Halverson of Halverson Construction Company. But if we want to get back a distance away from this, and if we are trying to evaluate whether we really had a joint venture or not, let me just put it this way. If there was no joint venture, and if the joint venture then wasn't responsible and didn't pay the bills, I don't have any business being here because there wasn't an entity. Instead of having two persons, as defined by the UPA, engaging jointly in a business for a profit, you would have Halverson doing its own thing and Midwest Foundation doing its own thing, and you wouldn't even have a joint venture. And since I'm representing the joint venture, I would be just as happy to be out on that basis. But the facts are, and the record and the law requires the interpretation of those facts, to be that you had here a joint venture, which means that equivalent to a partnership, because this court decided in Smith v. Metropolitan Sanitary District that a joint venture is a partnership for a single purpose, you have common liability and joint and several exposure, which means that the obligations of any of the three, if we have the joint venture up here at the top, we've got Midwest Foundation on the left, we've got Halverson on the right, their liabilities are identical. Each can be sued for the obligations incurred by or on behalf of the other. The Uniform Partnership Act, consistent with Section 21 of the Joint Venture Agreement, says specifically that where one of the partners or one of the joint venturers incurs expenses here, payroll expenses, those are the obligation of and will be paid by the joint venture or by the partnership. We have here a lawsuit in which it is recognized that the workers' compensation benefits were paid and are being received by these employees who have nonetheless turned around and sued the joint venture that ultimately paid the workers' compensation premiums and ultimately met the payroll expenses. Counsel, if we agree with your position, should this case be remanded for further evidence on the issue of whether the parties abided by the terms of the joint venture agreement and reimbursed Midwest for the workers' compensation payments? I don't believe there is any need to remand because the record, and I pointed out the testimony and the only evidence in the record is that these reimbursements were in fact made and that was brought to the attention of the Third District Appellate Court in our brief with citations to the testimony in the record of Steve Halverson and Barry Roman, Barry Roman of Midwest Foundation Company and Steve Halverson of Halverson Construction Company. Plus the fact you have the agreement itself and you have the law and you've got to make a stretch of imagination to say that the agreement was not performed or that the law did not apply. But we are perfectly willing and would welcome should the court decide to remand because I can point out with the canceled checks that the payroll expenses were made contemporaneously and the reimbursement for the workers' compensation premiums per the agreement were in fact paid. This is no charade. The reason I ask the question is you indicated that the Appellate Court erred in holding that defendants had conceded that they did not reimburse Midwest, right? Absolutely. And didn't you also indicate that that issue was not before the trial court so you didn't have an opportunity to make a meaningful record on this issue? We indicated that should that prove to be an actual issue. The question never came up until the Appellate Court raised it for some reason as if to imply that this was a charade of some sort, which it clearly was not. We nonetheless put in our brief to the court with citations to the record the actual point that those payments were in fact made. This came up on summary judgment, isn't that correct? There was no trial. That's right. This came up on summary judgment. We filed the summary judgment. No attack was made on the sufficiency of the motion. Nobody said, hey, we think that this is an artificial entity. We think that you're trying to pull the wool over our eyes. You didn't really make these payments at all. That was not an issue. It was accepted as a bona fide joint venture that performed its obligations, including the obligations under Section 21. Is that why the Appellate Court did not rely on Smith but looked to Schmidt and Milburn brothers? No. What the Appellate Court did there was, and I'm taking up more than my time, what the Appellate Court did there was to rely upon this court's decision in Forsyth v. Clark refining, and Forsyth v. Clark refining then made reference to Schmidt v. Milburn brothers. In Schmidt v. Milburn brothers, the case turned on the fact that there was no joint venture in operation between the employers of the two parties that were involved in the vehicular accident. The opinion says, and it is clear, that had there been actually a joint venture that they were both working on and they were co-employees engaged in the business of the joint venture, then the common liability, common immunity defense in Moran and in this court's decision in Smith v. Metropolitan would clearly apply. And in Forsyth, as we point out in our brief, the outcome there is antipodal to what they are doing here. In fact, that outcome supports what we are saying here because this court established a direct participation liability on the part of a parent corporation because of its own actions, not piercing the veil. It was not derivative liability. Instead, it was direct and independent liability, and that's why the workers' compensation defense under Sections 5 and 11 of the Workers' Compensation Act was not applied. Here you have shared and vicarious liability, which means that the defense and the immunity does, in fact, apply. If we look at it realistically, if you deprive or if the law deprives the joint venture of the ability to assert the immunity when it is jointly liable, and bearing in mind the joint venture had no employees of its own, when it is jointly liable, the end result is going to be that there will be no immunity for anyone connected with a joint venture because as soon as an employee of a joint venture has a claim, the joint liability of his own employer as a participant in the joint venture comes home to roost. So if he gets a judgment against the joint venture here, that can be collected against Midwest Foundation. That can be collected against Halverson. That's why you have a unity of exposures which requires a unity of immunities and defenses. May it please the Court, Counsel. I'm Greg Cerullo. I'm Counsel for Halverson Construction Company in this matter. I'm glad to entertain any questions that you may have in your mind because this has moved along rather rapidly. But Halverson's role, as I'm sure you could tell from the briefs, was of a joint venturer. They were one of the constituent joint venturers, Midwest Foundation and Halverson. Halverson's role on the project was, for all intents and purposes, defined by the joint venture agreement. It's the joint venture agreement that I believe is the real source of the legal arguments that we're making here before you today. There's an implicit in the appellate court arguments and opinion and the briefing that you've had the opportunity to review, is that for some reason or another a joint venture may be a liability avoiding device. I need to put that to rest, and I think as quickly as I possibly can. The joint venture in a situation like this, where you have two companies involved in the road construction business, these companies are required if they are going to ever have the opportunity to bid on large-scale projects like the McLuggage Bridge project. Neither of them, in and of themselves, with their own assets, have the ability to bond to satisfy the government. So they must bond, if you will, in another way through a joint venture, so that they can at least compete and bid against the Walsh Constructions of the world, the very large construction contractors. So at the outset, the joint venture has as its purpose the ability of businesses to engage in commerce, to involve themselves in very significant construction projects managed by ultimately the Illinois Department of Transportation. This joint venture agreement, the operative paragraph for the legal analysis, I think again, is paragraph 21, and that is the aspect of the joint venture agreement that spells out the responsibilities as between Halverson and Midwest Foundation and ultimately the joint venture for the payment of all payroll, payroll taxes, fringes, and other employee expenses, including but not limited to the establishment of workers' compensation insurance and the payment of all premiums therefore. And what you have is a device whereby the joint venture is able to enter into the contract with IDOT to complete the project. The funds flow from IDOT to the joint venture. The joint venturers submit their claims for the costs that they've incurred and ask that the joint venture reimburse them. The joint venture then reimburses them. If there's any profit, it's split according to the joint venture agreement, in this case 60% to Midwest, 40% to Halverson. If there's a loss, they bear the loss in the same manner. Because it's a joint venture, if there's an outstanding liability, and since the law in Illinois treats joint venturers as partners, if there's a liability, then the liability is coextensive. And by that I mean to say Midwest Foundation shall be liable for all liabilities. Halverson shall be liable for all liabilities. The joint venture shall be liable for all liabilities. All three entities are there to satisfy the call from those that say we are owed something from this. It's that premise or that legal relationship that I read to have been at the heart of the Smith case and the Moran case. And what those cases held, as I read them, is that under that circumstance, where you have the coextensive liability, there is also another side. And the other side of it is a simple premise again of partnership law. What defenses one partner has, he may assert if he's being called upon to answer for another partner's obligation. Mr. Cirillo, your time is up. Thank you for your argument. I apologize. Good morning, Justices, Chief Justice. My name is Dan O'Connor. I'm from the law firm of Annecy, Osmond, Rodin, Novak, and Cohen. I represent four of the plaintiffs here, Mr. Yeager, Mr. Folks, Mr. Folks' estate, excuse me, Mr. Bill, and Mr. McCombs. A couple of things that I wanted to address just briefly in response to Mr. Miller. His first statement was that the joint venture by its very nature should get immunity from liability. I don't think everybody in this state would agree with that. I think everybody would want a joint venture card because apparently that's a get-out-free card. Mr. Miller had said that the joint venture had paid the bills. In fact, the joint venture agreement in paragraph 21 says it is the full and complete responsibility of Midwest to in fact pay the workers' compensation bills. There is a clause that allows for reimbursement of business-related or labor-related expenses, but there is no evidence in this record in the testimony of Mr. Halverson and the gentleman from Midwest included, there is nothing in any of that testimony that specifically says that a workers' compensation premium or anything related to a workers' compensation benefit was in fact reimbursed by the joint venture. The fact that they submit periodic payments. Would this benefit from a remand? Would it benefit? Yes, on that factual issue. I think it would certainly clear up the record, but the fact is, Your Honor, there is nothing in the record at this point that there was in fact a workers' compensation payment. I don't believe you can come to the Supreme Court. There's nothing in the record that there was a workers' compensation payment? There is nothing in the record that says that the joint venture paid a check specifically for a workers' compensation premium reimbursement. Nothing. And to come to the Supreme Court and say, I can show you a canceled check when it's not in the record, I don't believe is appropriate. The fact is, there was a motion for summary judgment brought in this case. It was the burden of the movement to show that there is a matter of law. They are clear and free from doubt. There is no question of fact that they are entitled to summary judgment. You wouldn't expect them to issue several checks covering each of the number of things that they could have been billed for by their joint venture? Well, I think if they're billed for something, the bill should reflect what it's for. The bill should, but not the check. Either one, Your Honor, would show the fact that there was a reimbursement made, and the fact is, the record is devoid of either. These gentlemen coming in, they attempt to say, here's how a joint venture should work. That's terrific, but it doesn't mean that that's how this joint venture worked. In fact, the only time that you'll find out that this company wants to be a joint venture, there's two issues. One is when they want the work, and the second is when they come before this court and they don't want to pay any money as a result of their negligence. Those are the two times you're going to find out that they're claiming to be a joint venture. Should we analyze this case under partnership law? I believe that this case should be analyzed under the case that was decided before this court about a year ago named Forsythe and obviously Schmidt that was relied upon by Forsythe. I'm not sure if Forsythe wasn't a joint venture case. Forsythe was a case, Your Honor, that had key language in that situation. Although it was not a joint venture, it did have key language in this situation that the exclusive remedy protection clause in the Workers' Compensation Act should be a shield, not a sword. In this instance, the defendant is attempting to use it as a sword. They did not hire these gentlemen. It's uncontradicted in the record that in their very own briefs that they brought before this court, the joint venture points out the fact that these gentlemen were employees of Midwest. They were hired by Midwest. Counsel, I'm sorry. Yes, sir. If it is true what the people who've characterized themselves as joint venturers did was truly share expenses and it wasn't a charade, would they be entitled to the immunity that's provided in the act? If the joint venture itself actually paid the benefits for the workers' compensation either directly or through reimbursement, then I think they would be in a better position to claim that they're entitled to an exclusive remedy. However, in this instance, as pointed out in paragraph 21, it was Midwest full and complete. This is their agreement now, not mine, obviously, to pay the workers' compensation premiums. On that point, though, Mr. O'Connor. Yes, sir. Both Smith and Moran, they didn't discuss who paid the workers' compensation obligations under the act. They just found that the joint venture was entitled to the protection of Section 5A. So is that a red herring? I know that you point to Forsythe and Smith, but I believe that Justice Garmon's right. Those cases didn't involve joint ventures. So isn't Moran and Smith a little bit closer to what we have here? Well, Moran misinterpreted Smith because Moran said they followed Smith, but Smith, in fact, went through the analysis first before they found any determination as to who actually paid the benefits, who paid the comp premiums, who actually would have paid out on the comp case. Moran went directly to, oh, they're a joint venture? Well, then I guess you're off the hook. Moran never went through that initial analysis to find out who, in fact, paid the benefits. Well, Smith didn't discuss who paid the workers' compensation obligations under the act either, did he? Smith, as I understand it, the employee was a direct employee of the joint venture, if I'm not mistaken, Your Honor. And then the joint venture itself was looking for an immunity in that situation. Mr. McConner, following up on Justice Garmon's question that I don't think you answered, do we follow partnership law or do we not? I do not think that you do follow partnership law, to be specific, and I apologize for not answering your question directly, Your Honor. And it's your position, which would be contrary to what Mr. Miller was arguing, excuse me, that there has to be a direct payment either by the joint venture or there has to be a direct reimbursement of the workers' compensation premium payments by the joint venture. It cannot fall in the end that all of the liabilities are shared 60-40 and all of the profits are shared 60-40. I think his argument was that that even would be sufficient without any proof of payment because the net result would be the joint venture and Halverson ultimately would share in the expense. You're correct, and the fact is that the fact that they say that's how the partnership should have worked, nobody says that's how it did work. Nobody does say that there's a money trail here that was followed and bears out the fact that these expenses were borne by the joint venture or by Halverson. Remember, there's two different entities here. Halverson did nothing whatsoever to provide anything for these individuals in the form of compensation or workers' compensation benefits. So, Mr. O'Connor, if we disagree with your legal position, are you insisting that remand is necessary to flush out some of the facts, whether the joint venture agreement was being abided by? If the choices were, Your Honor, that either we win today, obviously, or we get to fight about it, and I will live to fight another day, and I'm not being facetious, but the fact is on this record we should win today. Were you not seeking remand at the appellate court level? I was seeking, no, sir, I don't believe we were. We were seeking to win at that point, and we did, and I think the third district did exactly what was appropriate. What these defendants want to do, they don't want to have an exclusive remedy. They want to have no remedy. If they didn't pay any benefits or they didn't take the obligations under the Comp Act as the employer, yet they get the shield of the employer, where is the justice there? What is the public service? What is the public policy that is served there? I would suggest to you that if that is the message of this court, that people do not have to pay the benefits that an employer would normally pay and bear those obligations, yet they get the benefit of not having any liability, it would lead to general contractors teaming up with all their subs as a joint venture. They can send all their safety guys on vacation, because there's really no burden on them to ensure a safe job site, ever. Because now they're a joint venture, why do they have to worry about policing a job site or making sure somebody is safe or worry about carelessness on the job? In fact, they could negligently walk along the building and knock guys off the roof and never have any liability because they're a joint venture. That clearly cannot be the message of this court. But if they have to share expenses and liabilities, it's not likely they're going to do that, is it? Well, if you're paying the workers' compensation premium, I would suggest in the financial aspect of things, it would be a lot cheaper to be an employer than it would be to be a third-party defendant. And the fact is that if you team up with your subcontractors. Are you saying this joint venture is a sham? In my opinion, this joint venture was set up for two reasons. One, to get a contract that they could not otherwise get to earn money. And two, to come before this court and not pay any money. Does anybody, would anybody believe that if these gentlemen were told, fellas, we have a great job for you, we're hiring you out of the union hall. And you're going to come out here and you're going to work for Midwest as an employer. But guess what, if Halverson does anything negligently or carelessly or if the joint venture does anything negligently or carelessly, we injure you, we maim you, we kill you. Under no circumstance is your heirs, your wife, your children, yourself, you're not ever going to collect one penny in any type of compensation. Help me, if I may. I'm sorry, Your Honor. Leaving these defendants out of it. Yes, sir. In a case in which partners embarked upon a joint venture and they shared the cost of the premiums for workman's compensation, would they have immunity after those benefits were paid? A true joint venture, I believe, would get the immunity of a true joint venture. Wouldn't it be great? Let me ask you a question. Yes, sir. Why aren't they a true joint venture? What about what they did is different than that legitimate partnership that we all agree would be protected? Everything on the job about this project was anything but a joint venture. Halverson had their guys here. Midwest had their guys here. The joint venture doesn't employ anybody. They have no employees, apparently. This is not a joint venture. This is two companies that couldn't get a job, and they had to go and they had to pretend to be one company so that they could apply. And Mr. Cerullo told you that in the beginning. They needed the work. That's how they applied for this, because they could qualify. And the fact is, once they got to the job, they didn't want to know each other. Is there anything under Illinois law that says that a joint venture cannot have its co-joint venture? Midwest do one aspect of the job and Halverson do another. Is that contrary to Illinois law? I believe that you can focus on one task or another, but the key is that the joint venture actually works as a joint venture, an entity that controls. And that entity has to abide by what, if they want the protection under the Act, Your Honor, it is my position that they have to do it the right way. If they want to make these guys joint venture employees, hire them as joint venture employees. Don't keep them Midwest. Don't keep them Halverson. And pay their comp benefits. Mr. Cerullo, when he addressed the third district appellate court. It's not enough that they share expenses. Well, first of all, nobody said they shared expenses pursuant to workers' compensation premiums. There is no piece of the record that says that at this point. It's not enough that the employees were covered by workers' comp. It's not. Because if Midwest covers their employees, why should the other people who have nothing to do with providing that protection benefit from the shield? My position would discourage small businesses from getting together to grow and to get some of the large contracts. My position would discourage big businesses from having unsafe job sites. That's what my position would do. This is not only a workers' compensation situation. This is not a workers' compensation case that brings us before Your Honor's courtroom. This is a third-party liability case where somebody wants to pretend to be the employer so they can say, we paid the benefits when, in fact, they did not. Mr. Cerullo had argued before the appellate court that the exclusive remedy was the key here. But when asked by Justice Carter if the plaintiffs could have sued the joint venture and Halverson in the workers' compensation case at the Industrial Commission, Mr. Cerullo's response on page 42 of that transcript was that it would have been resisted. If they're the employer and the proper remedy is workers' compensation, which is what they're claiming here, why would they then resist that remedy? The fact is the case was brought in the workers' compensation case against Midwest and Midwest only. Midwest and Midwest only paid those benefits or they were paid in their name by a carrier. Nobody from the joint venture or Halverson stepped in and said, oh, excuse me, Midwest, by all means, don't pay this because we're the employer. Include us on the form. Let us pay the benefit. Let us be the employer. That step was never taken. But to say to the appellate court that you would have resisted that, their attorney would exist. What they claim to be the exclusive remedy, that tells me one thing. They want it both ways. Go to the exclusive remedy that, by the way, we would have resisted, but don't come over here and ask us for anything because you should have gone to the exclusive remedy that we would have resisted. They want it both ways here. And that's simply not the law. The law is that it's supposed to be a shield and not a sword. And a shield provides protection for those that have undertaken the obligation to deserve that protection of the shield. It doesn't provide a sword for those who do nothing to deserve the protection to slash away the liabilities that they rightfully have. In this case, there's nobody coming in this courtroom saying the joint venture or Halverson did nothing wrong. There's nobody coming in to say, hey, we ran a safe job site. All they're saying is, please, protect us because we are the employer. We don't have anything in the record that shows we paid a check for premiums. In fact, we don't have testimony that says we paid a check for premiums. There's a question of fact here. And to bring it back to the beginning of how we got here. Halverson argues that the joint venture agreement, which was in the record, provides that Midwest was initially responsible for payment of all payroll, workers' compensation, insurance premiums, but that Midwest was entitled to reimbursement from the joint venture and thus indirectly from Halverson. Midwest was responsible for full and complete dealing with the workers' compensation benefits. Would that somewhat explain, though, your problem with the fact that Halverson might initially fight the fact that they were responsible? Do I question why they fight it? The fact is Midwest was responsible fully and completely by that contract to pay the benefits. They have a right to reimbursement basically at the discretion of the joint venture. That doesn't mean anybody paid it. So the fact that they have a right to reimbursement does not mean that it was completed. And the law, as I understand, Forsyth and Schmidt, is that if somebody does pay the benefit, they get the protection of the statute. This is an exception. This is a statute exception to the common law. I'm not going back to the fact that there's other cases that don't even focus on who paid the benefit. I understand that. I understand that. You know, your rather compelling argument regarding pushing people off the roof, you remember that? Yes, sir. I mean, couldn't you say the same thing about workers' compensation in general? That it's not a complete remedy? I agree it's not a complete remedy, and that's why there's third party. There's no pain, suffering, or disability. Joint ventures are not, that you're better off in that situation being an employer than a third party being sued because there's protections under the Act. There are protections under the Act. You're better for a number of reasons if you're the employer. Number one, you don't pay pain and suffering. Okay? Number two, if you do find a third party who is responsible under the Workers' Compensation Act, they get to recover up to 75 percent of their money out of the person who is responsible. My point is a little bit narrower than that. Yes, sir. My point is that your argument that joint ventures would be able to benefit under an Act and somehow the injured employee would be worse off and that third parties who may be sued are worse off, doesn't that same argument apply just to the single employer? Third parties would not be worse off. Third parties would be in great shape because every third party would now become a joint venture. Every general contractor would team up with every one of their subs, form a joint venture, file a piece of paper that says they're a joint venture, and that all you subs, you pay your comp benefits and we'll give you the right to reimbursement at our discretion. We may never pay it, but we'll give you that right. And guess what? We're not going to pay any benefits towards the comp and we're going to give you work that you might not otherwise get. It makes you allowed to get more work and more employment for your guys and more profit. And at the end of the day, we're not responsible. So we don't have to run a safe job site. It's all on you. No matter what they've ever promised an owner in the AIA contracts that gives them all the responsibility for safety and policing of the jobs, they could ignore all of it because they could pretend they're the employer. And I don't suggest that no joint venture should be allowed a protection. Do it correctly. If you're a joint venture and you want protection under the law, hire the people. Pay the comp premiums. Don't leave it to question. This is a summary judgment case where we have one fatality, two others that are unrelated, and three guys that plunge 60 feet into a river. One of them gets harpooned and stuck to the bottom of the river to drown until his friend comes and pulls him out. There are companies here who are negligent, who paid nothing to protect these workers before or after their injury, and they're trying to pretend that they're something that they're not. That should not be allowed, and it's my position that the public policy that this court would set would promote safe job sites, and it would still allow for people who do want to have the benefit of a joint venture to have this exclusive remedy if they simply take the steps to do it correctly and be honest. Mr. O'Connor. Yes, sir. Does your argument depend upon the belief that what you were faced with here was a sham by Halverson? Yes, and a great deal it does. And that's really what you're outraged about, it appears to me. Well, I'm outraged for a number of reasons, Your Honor. Number one, they didn't pay these premiums. There's nothing in the record that says they did. Number two is they ran an unsaved job site that resulted in some guys getting killed, and the fact is they've never been held accountable by any court. Well, as Justice Thomas indicated, that could happen. Your second story could happen in any workers' compensation case. This is not going to prevent all injuries, but it will promote safety, because if people are not allowed to put up sham joint ventures and avoid safety. There we are. And, of course, your position is that the record is adequate to demonstrate the sham. Yes, I believe it is. And certainly if you were to find that it wasn't adequate, then I suppose the remedy would be a remand. But the fact is that their burden was to bring the motion, they were to bring the evidence. They brought whatever evidence they had, and now we're left before an initial court, an appellate court, and now the Supreme Court of the State of Illinois. They still haven't shown a check to anybody. There's nothing in this record that has been demonstrative of their position. And the fact is there is not one trail that can show that one penny left the bank account of the joint venture or Halverson or any of their carriers to compensate any of the widows or injured individuals in this case. Not one penny. Did you raise that in response to their motion for summary judgment? Did I raise it in response to summary? Did you raise the sham in this issue before the trial court? Is that that was the question of material fact? There was a question of material fact as to the joint venture being an appropriate joint venture was set up, as I recall. There's also discussion of the long and the short of it is this. These guys are so in control of the work, they can't get out that way. They have to go and pretend to be the employer to get out that way. They were never going to get out on a 414 issue, which is the construction negligence issue. They were so entrenched in control and admissions of what they did, what they could do, how they could stop the work, how they had responsibilities to stop the work, they had to go the other route and say, you know what? We're so much able to stop the work and be in control of this, we better pretend we're the employer. And that's how this came to light. And that's how the arguments were brought under this exclusive remedy rather than under a 414 trying to escape liability for lack of duty. That's where we're at. The fact is we've got two negligent companies here who took a promise to run the job safely. They didn't. Three guys died. Other guys got injured. And now they're here before this court saying they shouldn't be held accountable for anything. If they did it correctly, they could receive the benefit of this court giving them protection. But to allow somebody who doesn't promotes other people to do the same. And that promotes unsafe job sites, and you're going to have guys that are getting hurt all over this state that we don't need. Are there any other questions I may address with the court? Otherwise, I'll thank you very much for your time. This, in my opinion, was a non sequitur of an argument addressed going back, let me say, we filed our motion for summary judgment based upon this court's decision in the Smith v. Metropolitan and the first district's decision in the Moran v. Gus K. Newberg. We showed that, and we did it by request to admit facts, that these employees of the Midwest Foundation were engaged in doing work on the joint venture project, and that they were injured and receiving workers' compensation benefits. We attached the joint venture agreement. There was no response to the motion that indicated that this was a sham, that this did not operate as a joint venture. There is no indication in the record anyplace that this joint venture did not operate as a true and legitimate joint venture. In fact, counsel makes the argument that these monies were not paid. They didn't raise the issue and say monies weren't paid, the payroll and the workers' compensation premiums weren't paid. The record shows that the testimony of Barry Roman and the joint venture would reimburse the companies for their wage and labor expenditure. That is correct, wage and labor expenditure. Those reimbursements which were required by Section 21 of the agreement and by Section 18B of the Uniform Partnership Act, according to this record, were actually made as if that were an issue that was before the trial court. It wasn't until we got to the appellate court that anybody said, well, were these payments actually made? The only indication in the record is what I just indicated, the testimony of Barry Roman and Steve Halverson. But we submit that the issue is not whether the payments were actually made. Go back to the premise of the Business Organizations 101. What did we all learn? If you want to shield yourself from liability, you use a corporate form. You don't use a partnership form. If you use a partnership or joint venture form, then by definition and by statute and by agreement, you are jointly and severally liable for all obligations. This isn't a device to shield the participants or members of a joint venture from liability. In fact, they have accepted liability because they are jointly and severally responsible for the payment of workers' compensation. In the event that any one of them doesn't pay, the others are in fact obligated to pay. If any of the creditors aren't paid, they're jointly and severally liable to pay the creditors. If any employees aren't paid, they're jointly and severally liable for the payroll. They have extended themselves by saying any obligation that's incurred or encountered in doing this joint venture product is the joint and several obligation of each of us. That is an expanse of liability and exposure, not a contraction of liability and exposure. Was a cross motion for summary judgment filed here? No. No. And when they resisted, as I indicated, they never raised anything other than saying this is a legitimate joint venture, but the joint venture shouldn't be entitled and Halverson shouldn't be entitled to a summary judgment. The issue of who paid what never came up until it was raised sui sponte at the appellate court level. And I will conclude my remarks by saying there is no requirement that a joint venture employ everybody. That is a fiction of counsel's own making. But if we engage in what he just argued, that Midwest Foundation didn't control the project in that they didn't have any employees and therefore could not control the project, then the joint venture isn't a proper party defendant to begin with. To the contrary, this is a joint venture to be treated as a partnership with joint liability and the end result is that if the joint venture or Halverson are held liable, whatever that liability is can be collected from any of the joint ventures, which would include the employer, so the immunity is vitiated in and of itself. I don't care if you or Mr. Cerullo answers this. I guess another justice has a question. How do you address, for lack of a better term, the public policy argument made by counsel? Well, the public policy argument, to the extent of saying this is a contractor of liability, I point out this is an expansion of liability. Why? Because if workers' compensation benefits, let's say, aren't paid by Midwest Foundation, then Halverson is liable for them, as is the joint venture. So you get back and you look at the rationale behind the Workers' Compensation Act, as we do in our brief, and that is the exchange of an automatic exposure for any injuries arising out of or in the course of employment without fault. And that is what each of these parties have agreed to do. They have expanded the workers' compensation base. Each of them is obligated for all of those benefits. He's arguing that there is a fortuity someplace, that somebody is going to have an accidental injury that will result in a recovery in excess of the amount of workers' compensation. Whether or not that happens is not of moment in the context of this case, because the joint venture and the co-joint venturers are jointly and severally liable for any and all legitimate exposures and to the extent that that liability pertains to one we submit, it must pertain to all. And that's what this court decided in Smith v. Metropolitan, and that's what the first district decided in Moran v. Gus Newberg. And there are no cases to the contrary. Joint liability begets joint defenses and immunities of necessity. Mr. Miller, I have two questions. Mr. O'Connor made the point about the, and I think he may have already answered this, but I want to make sure we get a clear understanding here, that in terms of these same employees who are the subject of the plaintiffs, the estates, whatever the case may be, that there was a workers' compensation settlement, there was a claim brought, the responded employer was Midwest, if I've got the names correct, and that the settlement contracts would have reflected a settlement between those individual employees, representatives, and Midwest only, is that correct? That would be correct. And under your theory, though, you don't think you have to be named on those settlement contracts to have the compensation? Absolutely not, because what you're looking at is the ultimate liability and who's going to pay it. So you run all expenses through the joint venture, and that would take into account the workers' compensation premiums, which resulted in the payment of the workers' compensation claims that came out on the settlement contracts. My second question is really twofold. To go back to what you made reference to, I thought you were maybe reading, maybe quoting, I'm not sure, about the testimony and the deposition from, is it Roman or? That was Roman, but immediately below it I didn't want to take the time. It's Halverson to the same effect. But did you read, was that a quote? That was a quote. And his statement was that they would make reimbursements, as in the future, as opposed to that they had? The quote is, then when it came time to get the joint venture for payroll, what was done is each individual company would pay their employees, and the joint venture would reimburse the companies for their wage and labor expenditure. Answer, that is correct. So you're talking about the ongoing course of conduct. And the second part, and maybe you can answer this, maybe not, but in the reply brief on page 3 of Halverson it talks about the affidavit of Roman and the attachments in reference to a contemporaneously filed motion to supplement the record, that apparently there was some need to supplement the record on actually proof of payment. And my question is, what's in this affidavit to supplement? That was not in the record at the time of the summary judgment hearing? That's right. That's right. There wasn't any reason for it. As the Court will recall, we filed a motion to supplement the record, which contained within it the affidavit of Barry Roman and the contemporaneous invoices and the canceled checks, showing that the payroll expenses were, in fact, made to these particular individual employees, as was the pro rata share of the workers' compensation premiums. But is Mr. O'Connor, this is my last question, correct or not, that in the record there is either no bill nor a payment that shows it was paid, whether it's in a lump, for several things, but nothing to reflect that it was a compensation payment? That's true because the issue never came up. It wasn't raised in resisting the motion for summary judgment. It was accepted that the motion for summary judgment was sufficient on its face. Nobody said, hey, procedurally you've got this tail out there, you've got the dog in it, but you don't have the tail prove that you actually made the payments. That was not an issue and never was an issue until the case went before the Third Appellate District when it was raised during oral argument. Thank you, counsel. Case is numbered 105. I'm sorry. That's all right. You go ahead. I'll light the red light. If I might add, just very briefly. I'm going to give you a minute. All right, one minute, one minute. You can always look at the converse. There was nothing brought forward by the plaintiff at the motion for summary judgment level to show that the payments weren't made. And it would be, to my way of thinking, their burden to establish a question of fact. They have, at the appellate level and at this level, turned it into an affirmative obligation that we were supposed to divine out where the existing case law at the time was Smith and Moran and it wasn't an issue. So maybe we weren't as good lawyers as we thought we were because we didn't see that issue coming and it became important now, especially in light of the Forsyth case, the concept of tracing the premium. I don't know whether there's any import that this court will attach to comments of a response I made to a question to Judge Carter, but I will very quickly. Judge Carter asked me, could Halverson have been sued by the injured employees in the Industrial Commission? My response verbatim was, I don't know. They didn't try. That's a clear hypothetical. I can't answer that question because it is hypothetical. And then I went on and surmised in the world of modern litigation, I would say to you that it would have been resisted. Knowing how litigious, knowing how contentious the litigation world is, but the appropriate and proper response is, had they done that, it would have been proper to tender them to the Midwest Foundation people who were their employers and go through that process of the benefits. And then if the benefits remained unpaid after an award, recover them from the joint venture, recover them from Halverson because, by gosh and by golly, Halverson had the coextensive liability in the end for those. I went more than a minute. I apologize. Thank you. Thank you. Cases number 105-912 and 105-917 consolidated will